Justin T. Quinn, Esq.
Michael J. Gesualdo, Esq.
**ROBINSON MILLER LLC**
Ironside Newark
110 Edison Place, Suite 302
Newark, New Jersey 07102
Telephone No.:  (973) 690-5400
Facsimile No.:  (973) 466-2761
jquinn@rwmlegal.com
mgesualdo@rwmlegal.com

*Attorneys for Plaintiff*
*John Nekic, Liquidating Trustee*
*for Medical Training Group, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN NEKIC, LIQUIDATING TRUSTEE FOR MEDICAL TRAINING GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>STANLEY FURST, MEDIXHEALTH, LLC, MEDSURG, & WESTSURG,<br><br>Defendants. | Civil Action No.:<br><br>*Document electronically filed.*<br><br>**COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF**<br><br>**Jury Trial Demanded** |

Plaintiff John Nekic, Liquidating Trustee for Medical Training Group, LLC, by and through his attorneys, Robinson Miller LLC, commences this lawsuit to disgorge hundreds of thousands of dollars that Defendants unlawfully obtained through the use of fraud and other deceptive acts.  Plaintiff avers as follows:

## PARTIES

1.Plaintiff John Nekic, Liquidating Trustee for Medical Training Group, LLC ("Plaintiff" or "Nekic"), is a citizen of the State of Ohio.

2. Defendant Stanley Furst ("Defendant Furst") is a citizen of the State of New Jersey, residing at 609 Binghampton Lane, Livingston, New Jersey 07039.

3. Defendant Medixhealth, LLC ("Defendant Medixhealth") was registered as a New Jersey LLC on February 1, 2017. Its principal place of business is located at 609 Binghampton Lane, Livingston, New Jersey 07039.

4. Defendant Furst is the registered agent and authorized signatory for Defendant Medixhealth.

5. Upon information and belief, Defendant Medsurg is a fictitious company, with a principal place of business located at 609 Binghampton Lane, Livingston, New Jersey 07039.

6. Upon information and belief, Defendant Westsurg is a fictious company, with a principal place of business located at 609 Binghampton Lane, Livingston, New Jersey 07039.

7. Upon information and belief, Defendant Medsurg and Defendant Westsurg are operated and controlled by Defendant Furst.

8. Upon information and belief, Defendant Medixhealth, Defendant Medsurg, and Defendant Westsurg conduct no legitimate business; each was formed solely to further Defendant Furst's fraud, so that he could hide and misappropriate significant sums of money that were being laundered by his son Lucas Furst.

9. Lucas Furst—a resident of Nevada—is not a named Defendant in this lawsuit. Lucas Furst currently is involved in pending litigations in the United States District Court for the Northern District of Ohio, the substance of which concerns similar allegations to this action and are being addressed by that court. For that reason, Lucas Furst is not a defendant here and Plaintiff does not intend to add him to this lawsuit. In addition, Defendants Furst, Medixhealth, Medsurg, and Westsurg are not parties to the Northern District of Ohio litigations.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the dispute is between citizens of different states and involves an amount exceeding $75,000.

11. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1).

## BACKGROUND

12. Plaintiff has a medical degree and has spent his career focusing on medical education. Nekic has worked to develop new medical schools, served in various positions at medical schools, and has operated businesses that help medical schools secure needed clinical opportunities for their students.

13. In the early 2000s, Nekic met Defendant Furst's son, Lucas Furst ("Lucas"), while Lucas was attending a medical school where Nekic was a faculty member. The two quickly formed a mentor/mentee relationship.

14. Ultimately, Lucas was dismissed from that medical school due to poor performance, and never became a practicing physician.

15. Years later, in 2013, Nekic crossed paths again with Lucas. Nekic saw that Lucas was struggling financially and agreed to teach him how to work with medical schools and hospitals to coordinate clinical medicine programs.

16. Nekic directed Lucas to form a limited liability company in Nevada known as Medical Training Group, LLC ("MTG"), in which Nekic would be the owner and Lucas would be an employee. Nekic agreed to allow Lucas to share in MTG's profits.

17. The market need for this venture was clear: In the United States, medical students receive both a traditional education (consisting of several semesters of formal in-class schooling), as well as a practical, hands-on education, in which students are required to obtain clinical

experience while working under the supervision of licensed physicians in hospitals or other clinical settings.

18. As a result, medical schools commonly have many students working alongside physicians at any given time. And while many medical schools have a full-time staff devoted to arranging the placement of medical students and coordinating the payments for the placements, others do not.

19. Medical schools that do not have a full-time staff devoted to coordinating placement of medical students, rely on outside contractors to fill this void. And that is precisely what MTG did.

20. MTG's business model was straightforward. MTG would contract with certain medical schools to secure clinical experience opportunities for their medical students. MTG would then locate hospitals and doctors willing to provide these medical students with clinical experience opportunities.

21. The medical schools paid MTG a negotiated fee each semester. And MTG would pay the doctors and hospitals a negotiated fee for providing the clinical opportunities.

22. Anything left after MTG paid its expenses would be split between Nekic and Lucas.

23. Nekic oversaw MTG's entire operation, except Las Vegas. Lucas insisted on controlling this territory and handling operations without any oversight. This included complete control over accounts payable.

24. In or around 2018, Lucas's misuse of corporate funds became a big issue. Nekic noticed that MTG was struggling to pay its bills, and he began receiving complaints from doctors and hospitals who Lucas had not paid.

25. Upon receiving these complaints, Nekic took a close look at MTG's financials for

Lucas's Nevada territory and found numerous irregularities.

## THE FRAUD

26. Plaintiff noticed that between February 2017 and December 2018 Lucas funneled hundreds of thousands of dollars—*via* checks—to three New Jersey "companies," which Nekic had never seen or heard of before. These funds should have been used to pay existing MTG vendors.

27. The New Jersey companies that received checks from Lucas were Defendants Medixhealth, Medsurg, and Westsurg.

28. Nekic had no record of these entities being vendors of MTG; nor was there any documentation for the invoices listed on the checks Lucas signed and paid.

29. Consequently, Nekic investigated Defendants Medixhealth, Medsurg, and Westsurg, as well as the payments each received and the accounts in which the checks were deposited.

30. What Nekic learned was illuminating. Nekic learned that:

    a. Defendant Medixhealth was established by Defendant Furst in February 2017, only a *few days* before Lucas signed the first check to this company;

    b. Defendant Medixhealth had the *same* registered address as Defendant Furst—*i.e.*, 609 Binghampton Lane, Livingston, New Jersey 07039;

    c. Defendant Furst is the only authorized signatory for Defendant Medixhealth;

    d. Defendant Medixhealth received 119 checks signed by Lucas, totaling $552,935.00;

    e. Defendant Medsurg received 7 checks signed by Lucas, totaling

$46,200.00; and

 f. Defendant Westsurg received 17 checks signed by Lucas, totaling $106,600.00.

31. This was all part of a fraudulent scheme concocted by Lucas in or around early 2017, with the assistance of Defendant Furst.

32. Defendant Furst agreed to conceal the fraud by setting up three shell companies—with healthcare-sounding names—to funnel the monies out of MTG's account. Defendant Furst also agreed to submit sham invoices to Lucas, intentionally misrepresenting any work that was supposedly performed by Defendants Medixhealth, Westsurg, and Medsurg.

33. With the fraud's framework in place, Lucas began paying the Defendants' sham invoices and misappropriating MTG's funds.

34. Upon information and belief, Defendant Furst then diverted these proceeds into at least one account that he controls.

### THE AFTERMATH

35. After performing his investigation, Plaintiff Nekic confronted Lucas. Lucas admitted to the entire scheme, including the improper payments to Defendant Furst's companies—*i.e.*, Defendants Medixhealth, Medsurg, and Westsurg. Lucas's admission is documented by a promissory note in which Lucas admits to "fraudulently transferr[ing]" significant sums from "Medical Training Group, LLC."

36. Plaintiff Nekic then contacted Defendant Furst requesting that he return the misappropriated funds.

37. Defendant Furst refused, and any notion of a quick, equitable resolution ceased.

38. MTG was later dissolved on February 6, 2019.

## COUNT ONE
## CONVERSION – NEW JERSEY LAW

39. Plaintiff repeats and realleges his allegations in paragraphs 1 through 38 as if fully set forth herein.

40. Neither Defendant Furst nor Defendants Medixhealth, Medsurg, and Westsurg performed any work for MTG.

41. Consequently, neither Defendant Furst nor Defendants Medixhealth, Medsurg, and Westsurg had any right to the payments they received.

42. Upon information and belief, Defendant Furst has now wrongfully exercised control over MTG's monies by diverting the funds into his personal bank accounts and/or accounts that he controls.

43. Plaintiff attempted in good faith to resolve this matter by requesting that Defendant Furst return the $705,735.00 that—upon information and belief—has been funneled into one of Defendant Furst's accounts.

44. Defendant Furst refused, thereby excluding Plaintiff from his rightful property.

45. Accordingly, Defendant Furst has committed conversion. Defendant Furst (a) unlawfully stole Plaintiff's property (*i.e.*, $705,735.00); (b) setup shell companies to conceal the fraud; (c) diverted the fruits of this fraud to his personal bank accounts and/or accounts that he controls; and (d) has refused to return the money that he was never authorized to take.

## COUNT TWO
## TORTIOUS INTERFERENCE – NEW JERSEY LAW

46. Plaintiff repeats and realleges his allegations in paragraphs 1 through 45 as if fully set forth herein.

47. Plaintiff has spent many years developing his clients and maintaining relationships

with numerous medical professionals, hospitals, and medical schools.

48. And it was MTG's contractual obligation to ensure that these physicians and hospitals were compensated for the service they were providing—namely, clinical experience opportunities for medical students.

49. Defendant Furst—through his son Lucas—was aware of Plaintiff's relationships and knew that MTG was contractually obligated to pay physicians and hospitals for their services.

50. Yet, Defendant Furst, through his fraudulent acts, made sure that MTG could not perform its contractual obligations to compensate certain physicians and hospitals. As a result, these relationships were terminated.

51. There was and is no legitimate justification for Defendant Furst's conduct. He knowingly participated in a scheme that was designed intentionally to loot an account, misappropriate hundreds of thousands of dollars, and interfere with MTG's business.

52. But for Defendant Furst's unlawful and fraudulent conduct, $705,735.00 would have remained in MTG's corporate account where it would have been used by Plaintiff to pay physicians and hospitals, as MTG was contractually obligated to do.

53. By diverting $705,735.00 from MTG, Defendant Furst has not only damaged Plaintiff financially, but Defendant Furst also has caused Plaintiff reputational harm, since Plaintiff's clients were not timely paid, terminated their relationship, and are unlikely to do business with Plaintiff in the future.

## COUNT THREE
## COMMON LAW FRAUD – NEW JERSEY LAW

54. Plaintiff repeats and realleges his allegations in paragraphs 1 through 53 as if fully set forth herein.

55. At some point prior to February 1, 2017, Defendant Furst had a conversation with

Lucas. The two discussed and agreed to a fraudulent scheme that would involve Lucas funneling significant sums of MTG's money to Defendant Furst.

56. On February 1, 2017, Defendant Furst registered Defendant Medixhealth as an LLC with the State of New Jersey. At some point thereafter, Defendant Furst created the other fictitious entities—Defendants Westsurg and Medsurg.

57. Defendant Furst knew that Defendants Medixhealth, Westsurg, and Medsurg did not function as legitimate businesses and performed no services for MTG; they served simply as fronts to conceal the fraud.

58. Defendant Furst nonetheless began submitting sham invoices to Lucas for processing and payment. Each sham invoice is identified on the checks that Lucas cut.

59. The first check that Defendant Medixhealth received is dated February 21, 2017. The final check Defendant Medixhealth received is dated December 26, 2018. In total, Defendant Medixhealth received 119 checks and was paid $552,935.00.

60. The first check Defendant Westsurg received is dated September 18, 2018. The final check that Defendant Westsurg received is dated December 29, 2018. In total, Defendant Westsurg received 17 checks and was paid $106,600.00.

61. The first check that Defendant Medsurg received is dated August 13, 2018. The final check that Defendant Medsurg received is dated December 6, 2018. In total, Defendant Medsurg received 7 checks and was paid $46,200.00.

62. Defendant Furst knew that (a) Defendant Medixhealth did not do any work for MTG; (b) Defendant Medixhealth was not entitled to receive any payment from MTG; and (c) the invoices he submitted were shams, laden with misrepresentations of work that was supposedly done on MTG's behalf.

63. Defendant Furst knew that (a) Defendant Westsurg did not do any work for MTG; (b) Defendant Westsurg was not entitled to receive any payment from MTG; and (c) the invoices he submitted were shams, laden with misrepresentations of work that was supposedly done on MTG's behalf.

64. Defendant Furst knew that (a) Defendant Medsurg did not do any work for MTG; (b) Defendant Medsurg was not entitled to receive any payment from MTG; and (c) the invoices he submitted were shams, laden with misrepresentations of work that was supposedly done on MTG's behalf.

65. Upon information and belief, and in furtherance of the fraud, Defendant Furst misappropriated the payments made to Defendants Medixhealth, Medsurg, and Westsurg by depositing the checks into his personal bank accounts and/or accounts that he controls.

## COUNT FOUR
## CIVIL CONSPIRACY – NEW JERSEY LAW

66. Plaintiff repeats and realleges his allegations in paragraphs 1 through 65 as if fully set forth here

67. At some point before February 1, 2017, Defendant Furst and Lucas discussed and agreed to engage in a fraudulent scheme, by which Defendant Furst would aid in embezzling significant sums of money from MTG.

68. As a result of this agreement and in furtherance of the conspiracy, Defendant Furst created three shell companies, Defendants Medixhealth, Westsurg, and Medsurg.

69. Defendant Furst did not setup these companies for a legitimate commercial purpose; instead, he established Defendants Medixhealth, Westsurg, and Medsurg to conceal the fraud.

70. In other words, Defendant Furst created fictitious entities with healthcare related

names for a reason: To make it seem that these were legitimate expenditures being paid by MTG. They, of course, were not.

71. Defendant Furst would then submit sham invoices to MTG. Once payment was tendered, Defendant Furst would, upon information and belief, funnel the proceeds into personal bank accounts and/or accounts that he controlled.

72. This plan was designed to financially injure MTG. And it did just that, as MTG sustained damages of at least $705,735.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Enter judgment in Plaintiff's favor against Defendants on each cause of action;

B. Award Plaintiff compensatory damages for the injuries Plaintiff has suffered as a result of Defendants' misconduct and fraud.

C. Enter a preliminary injunction preventing Defendants from further misappropriating the $705,735.00.

D. Award Plaintiff the costs of filing this litigation, including attorneys' fees and costs.

E. Award Plaintiff punitive damages.

F. Grant any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

- 12 -

Dated:  February 27, 2020            ROBINSON MILLER LLC

           s/ Justin T. Quinn
           Justin T. Quinn, Esq.
           Michael J. Gesualdo, Esq.
           **ROBINSON MILLER LLC**
           Ironside Newark
           110 Edison Place, Suite 302
           Newark, New Jersey 07102
           Telephone No.:  (973) 690-5400
           Facsimile No.:  (973) 466-2761
           jquinn@rwmlegal.com
           mgesualdo@rwmlegal.com